IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

AFFIDAVIT

I, Nicholas C. Mittag, affiant, seek authorization for a search warrant, and having been duly sworn, do hereby state the following:

## Introduction

1. I have been a Law Enforcement Officer for over fifteen years. I am currently assigned to the Springfield, Missouri, Police Department (SPD) Narcotic Enforcement Team (NET) and as a Task Force Office (TFO) with the Drug Enforcement Administration (DEA). I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been assigned to NET for two years. Prior to being assigned to NET, I was assigned to the Special Investigation Unit for five and a half years, which primarily investigates gang activity and violent and repeat offenders in the Springfield, Missouri, area. I have received specialized training and attended seminars relating to the manufacture, distribution, and possession with the intent to distribute controlled substances. From my training and field experience, I have extensive knowledge of complex illegal drug distribution and manufacturing organizations.

3. During my career, I have conducted and participated in more than five hundred (500) investigations involving the importation, transportation, possession with intent to distribute, and distribution of controlled substances, including but not limited to, heroin, as well as the related laundering of monetary instruments, the conducting of monetary transactions

1

involving the proceeds of specific unlawful activities, and conspiracies associated with criminal drug offenses. In conducting these investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, undercover purchases, electronic intercepts, and various types of informants and cooperating sources.

4. In addition to my experience in conducting criminal investigations, I have received specialized training from the DEA and other law enforcement agencies. The trainings focused on methods of unlawful drug trafficking; the identification of controlled substances; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.

5. I have participated in the execution of numerous search warrants in the investigation of drug trafficking. These warrants covered the search of locations to include residences of drug traffickers and their co-conspirators and associates; drug manufacturing operations; stash houses used as storage and distribution points for controlled substances; and business offices used by drug dealers as fronts to legitimize their unlawful drug trafficking activities and to conceal the proceeds obtained from unlawful drug trafficking.

6. Based upon my training and experience, I know that drug couriers and traffickers commonly use multiple methods of communication to arrange transactions and conduct business. Cellular phones, personal computers, and other devices are frequently used to send and receive coded messages over long distances. Drug traffickers commonly maintain financial records reflecting accounting of monies collected and disbursed for the purchase and sale of controlled substance. These records have been discovered written on paper and recorded in

Case 6:17-sw-02069-DPR   Document 1-1   Filed 08/03/17   Page 2 of 20

digital files on computers, phones, and other similar devices. Records also may include the transfer of monies involved in the sale and procurement of narcotics. Records may reflect the laundering or concealment of the profits from the sale of the narcotics, as proceeds from narcotics trafficking cannot be legally declared. In my experience, it is common for individuals engaged in illegal narcotics activities to utilize a phone or computer to prepare and store documents relative to, and in connection with, their illegal activities. These records are typically stored on the devices' memory or on external memory devices.

7. Based upon my training and experience, I know that cellular or wireless phones and their compatible hardware in conjunction with computer software are often utilized to store records which include, but are not limited to, those relating to business activities, criminal activities, associates names and addresses, and the identity and location of assets illegally gained through these criminal activities. These records are more fully described as information or data stored in the form of electronic or magnetic coding on cellular phone and computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard drives and removable SIM cards, hard drive cartridges, laser disks, tapes, floppy diskettes, and any other media capable of storing magnetic coding.

8. Based on my training and experience, I know that electronic files can be received, stored, and easily moved from one cellular telephone or electronic storage medium to another. Therefore, electronic files downloaded to, or created on, one cellular phone can be copied to, or transferred to, any other cellular phone, computer, or storage medium at the same location. In addition, based on my experience, I know that searching digitalized information for evidence of crime often requires the assistance of a qualified cellular phone or computer expert

who can accurately retrieve the systems data in a laboratory or other controlled environment. This is true because of the following:

 (a) Volume of evidence: Cellular phone storage devices such as SIM cards, hard disks, diskettes, tapes, and laser disks can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive type file names. This may require searching authorities to examine all of the stored data to determine which particular files are evidence or instrumentalities of the crime. This sorting process can take weeks to months, depending on the volume of data stored.

 (b) Technical requirements: Searching cellular phone systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from the destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover hidden files; and, performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

9. Based on my training and experience, I know that cellular phones often contain information that will help identify sources of supply and the intended recipient of the illegal drugs. I know that often time's narcotic traffickers refer to other co-conspirators by first name only or by nickname and store such information in the electronic memory of cellular telephones. I know that retrieving names, phone numbers, and photographs assists in further identifying

sources of supply and co-conspirators that would be difficult or nearly impossible to identify without direct knowledge of these individuals and their drug trafficking organization. I know that traffickers utilize mobile phones and digital cameras to photograph narcotics and proceeds from the sale of narcotics. I know that drug traffickers photograph themselves with other co-conspirators and many times photograph themselves, and that these photographs can be transferred to computer memories.

10. Based on my training and experience, I know that once data is electronically encoded on a device, including cellular phones and computers, that the data will remain on the device indefinitely, even after it is deleted using standard methods in most circumstances.

11. The information contained in this affidavit is based upon my personal knowledge and investigation, as well as information provided to me by other law enforcement agents involved in the investigation of this case.

12. This affidavit is made in support of an application for a warrant to search: a black in color, Samsung brand flip style cellular telephone; a gray and black in color Apple iPhone; a white in color iPhone; and a black in color iPhone, which are more fully described in Attachment A and is further based upon information that would establish probable cause to believe that evidence of violations of 21 U.S.C. §§ 846, 843 and 841(a)(1), conspiracy to distribute controlled substances, unlawful use of a communication facility, and distribution or possession with the intent to distribute a controlled substance is located on the cellular phones identified in Attachment A. Based upon the following information, there is probable cause to believe that evidence, fruits and instrumentalities of the possession and/or distribution of controlled substances, in particular, heroin, is located within the above-described cellular

5

phones. The evidence, in electronic form, may include the information described in Attachment B regarding possible violations of 21 U.S.C. §§ 846, 843, and 841(a)(1).

13. In September 2016, DEA began investigating a heroin drug trafficking organization (DTO) operated by Jovan DENSON and others in the Springfield, Missouri, area.

14. From September of 2016, to April 2, 2017, the DEA conducted an investigation during which we determined that DENSON was utilizing multiple telephones to distribute heroin. The relevant telephone numbers are as follows: (316) 789-3202 (DENSON TARGET TELEPHONE 1), (406) 780-1939 (DENSON TARGET TELEPHONE 2), (312) 497-1157 (DENSON TARGET TELEPHONE 3), and (708) 446-9542 (DENSON TARGET TELEPHONE 4).

15. The telephone numbers for DENSON TARGET TELEPHONE 1 and DENSON TARGET TELEPHONE 4 were provided by a known and reliable confidential source (CS), whose information was corroborated by toll records, controlled purchases of heroin from DENSON, and surveillance.

16. The controlled purchases from DENSON by the CS were as follows:

17. On December 5, 2016, SPD and DEA conducted a controlled purchase of heroin from DENSON using the CS. The CS contacted DENSON via text message and arranged for the purchase of heroin. DENSON directed the CS to meet him at the parking lot located at 1137 West Kearney Street, Springfield, Missouri. DENSON arrived at the location driving a blue 2017 Chevrolet Impala. The CS got into the passenger side of the vehicle for a short time. The CS then got out of the vehicle, and the vehicle left the location. The CS purchased 3.8 grams of heroin from DENSON for $500.00. After the CS purchased the heroin from DENSON, it was

6

relinquished to investigators. The suspected heroin was field-tested and showed a positive result for the presence of heroin.

18. On December 8, 2016, DEA conducted a controlled purchase of heroin from DENSON using the CS. The CS contacted DENSON via text message. DENSON called back later and directed the CS to the parking lot of Ye Olde Buggy Bath, a car wash located at 1137 West Kearney Street, Springfield, Missouri. During the telephone call, DENSON agreed to sell the CS 10 grams for a "stack." I listened to this telephone call as it occurred. Based on my training and experience, I know that, in the context of purchasing drugs, a "stack" is commonly used to describe $1,000. DENSON directed the CS to meet him on the street just north of the car wash because DENSON thought he was being followed. At approximately 4:50 p.m., DENSON arrived at the location driving the Impala. I observed DENSON pull the vehicle around to the north side of the car wash on Della Street. The CS got into the front passenger seat of the vehicle. DENSON then drove the vehicle south on Johnston Avenue and across Kearney Street, where the CS exited the vehicle. DENSON then left the location. The CS had purchased 10 grams of heroin from DENSON. After the purchase, the CS relinquished a plastic bag containing suspected heroin. The suspected heroin was field-tested and showed a positive result for the presence of heroin.

19. On February 27, 2017, the CS met with me to conduct a controlled purchase of heroin from DENSON. The CS sent DENSON a text message to ask if they could meet. The CS then placed a recorded telephone call to DENSON to arrange for the purchase of heroin. The CS was followed to the meeting location, which was set by DENSON. On the way to the meeting location, the CS received a telephone call from DENSON, which directed him/her to meet around the corner from the original meeting location. DENSON told the CS to meet on

7

Warren Avenue, south of Division Street, which was a block away from the original meeting location set by DENSON. The CS met DENSON, who was driving a Nissan Altima, at the intersection of Warren Avenue and Lynn Street. I observed a hand-to-hand exchange through their respective driver's side windows, and both vehicles left the location in opposite directions. I observed DENSON was the driver and sole occupant of the Altima. Visual surveillance was maintained of the CS as he/she drove back to a predetermined meeting location. I picked up the CS at the predetermined meeting location. At that time, the CS relinquished a plastic bag that contained approximately 10 grams of suspected heroin. The CS also confirmed that the person from whom he/she purchased the suspected heroin was DENSON. The substance was tested with a Nar-Tec field test kit. The test showed a positive result for the presence of heroin.

20. On March 23, 2017, the CS met me to conduct a controlled purchase of heroin from DENSON. The CS then placed a telephone call to DENSON to arrange for the purchase of heroin. The CS was followed to the meeting location at Culvers at 2520 North Glenstone Avenue, Springfield, Missouri. On the way to the meeting location, the CS sent a text message to the DENSON stating: "Over at patio of culvers….xETA???." I later viewed and photographed the text message to DENSON. The CS then received a telephone call from DENSON, who said he was on his way, and would be there soon. DENSON arrived at the meeting location a few minutes later in a dark red Ford Taurus. The vehicle was driven by an unknown black female and DENSON was a passenger. The CS got into the back seat of the vehicle and met with DENSON. The meeting was audio recorded and a copy of the meeting was retained as evidence. The CS then exited the vehicle and DENSON left the location in the vehicle. Visual surveillance was maintained of the CS as he/she walked back to a predetermined meeting location. I picked up the CS at the predetermined meeting location. At

that time, the CS relinquished a plastic bag that contained approximately 10 grams of suspected heroin. CS also confirmed that the person from whom he/she purchased the suspected heroin was DENSON. The substance was tested with a Nar-Tec field test kit. The test showed a positive result for the presence of heroin.

21. In each buy, the CS was searched before and after the buys to ensure he or she did not have any controlled substances, cash, or other contraband.

22. The telephone number for DENSON TARGET TELEPHONE 2 was originally determined through a toll analysis of frequent callers to DENSON TARGET TELEPHONE 1 and a prior telephone number for DENSON, also provided by the same confidential source. I confirmed that DENSON was using DENSON TARGET TELEPHONES 2 and 3 through the use of a cell-site simulator on April 13, 2017.

23. A cell-site simulator is a portable cell tower that can electronically force a cellular telephone to register its mobile identification number ("MIN," i.e., telephone number) ESN, and/or IMSI number when the cellular telephone is turned on. Cell data is being transmitted continuously as a necessary aspect of cellular telephone call direction and processing. The necessary signaling data (ESN/MIN/IMSI, channel/cell-site codes) are not dialed or otherwise controlled by the cellular telephone user. Rather, the transmission of the cellular telephone's ESN/MIN/IMSI to the nearest cell site occurs automatically when the cellular telephone is turned on. This automatic registration with the nearest cell site is the means by which the cellular service provider connects with and identifies the account, knows where to send calls, and reports constantly to the customer's telephone a read-out regarding the signal power, status, and mode. If the cellular telephone is used to make or receive a call, the screen of the cell-site simulator would include the MIN, the call's incoming or outgoing status, the cellular

9

telephone's ESN, and/or the IMSI number, and the date, time, and duration of the call. By identifying (through conventional physical surveillance) the physical presence of a known target at multiple geographically disparate locations and taking cell-site simulator readings, investigators may be able, by analyzing data reflecting common MIN, ESN, or IMSI information, collected from these geographically disparate sites, to identify which cellular telephone(s) are being utilized by the target.

24. The device was utilized in the Western District of Missouri on April 13, 2017, at locations where DENSON was present, which we confirmed by physical surveillance. Those locations were the Midwest Technical Institute at 3600 South Glenstone Avenue, Springfield, Missouri; Norma's Carriage House at 1537 North Glenstone Avenue, Springfield, Missouri; DENSON's home at 919 North Homewood Avenue, Springfield, Missouri; and the Baymont Inn at 3343 East Battlefield Road, Springfield, Missouri. At each location, surveillance saw that DENSON was present and at each location, the cell site simulator was utilized.

25. The simulator obtained identifying information for three common devices at the locations. Based on information I had already obtained from Verizon Wireless, I was able to determine that two of the devices were DENSON TARGET TELEPHONE 1 and DENSON TARGET TELEPHONE 2. We obtained additional identification information that did not match any of the previous identification information that I had for DENSON TARGET TELEPHONES 1, 2, or 3. I sent an administrative subpoena to Verizon Wireless to determine the telephone number for the third device. On April 21, 2017, Verizon Wireless responded and verified that the third common device was DENSON TARGET TELEPHONE 3.

26. Previously, on April 3, 2017, United States District Court Judge Douglas Harpool signed an order authorizing the interception of wire and electronic communication for DENSON TARGET TELEPHONE 1. Interception began on April 4, 2017, and ended on May 3, 2017.

27. On May 10, 2017, United States District Court Judge Douglas Harpool signed an order authorizing the interception of wire and electronic communication for DENSON TARGET TELEPHONES 2, 3, and 4. Interception began on May 10, 2017.

28. On May 12, 2017, based on monitored and intercepted conversations, as well as surveillance, investigators knew DENSON was traveling to Chicago, Illinois, because he told several people he was going to Chicago to visit his son for prom and graduation. Based on my training and experience, I know that Chicago is a common and known source area for heroin coming into the Springfield, Missouri, area.

29. On May 12, 2017, investigators intercepted telephone conversations between DENSON and an unknown male who appeared to be traveling with him to Chicago in a second vehicle. DENSON called the unknown male several times to comment on that the Unknown Male was swerving while driving, indicating that the Unknown Male was in a separate vehicle, but that they were remaining close together. Based on my training and experience, I know that dealers who deal in large quantities of narcotics will often use a transportation tactic such as having multiple vehicles traveling in tandem to transport narcotics or currency from one location to another. I believe DENSON was using such a tactic by having a second unknown vehicle following him to Chicago.

30. I also know that dealers in large quantities of narcotics will frequently have someone else transport the narcotics to avoid being caught with the narcotics themselves. During DENSON'S trip to Chicago, investigators also monitored conversations where

11

DENSON said "G" or "Gerald" was with him and driving his vehicle. During the course of this investigation, the only "Gerald" known to be involved in the investigation is Gerald POPE.

31. While DENSON was in Chicago, we intercepted phone conversations and received information from the same CS that in DENSON'S absence, POPE's girlfriend was continuing to deliver heroin to DENSON's distributors.

32. On May 12, 2017, at 4:31 p.m., investigators intercepted a telephone call from DENSON TARGET TELEPHONE 3 to telephone number (708) 821-7785, a number associated with Gerald POPE (GP). An administrative subpoena showed this phone to be subscribed to POPE. The conversation between DENSON (JD) and POPE (GP), as transcribed by the officers monitoring the conversation, stated—

GP: Yeah.
JD: Yeah my dumb ass phone is fucking up. I do not have the right charger for that phone, it just keep going dead, dead, dead They got rides, I'm just gonna have them go to the dollar store. Whenever she close.
GP: Inaudible.
JD: Yeah, they pretty much just waiting on my call. I'm just keeping them posted.
GP: Tell them to go to the dollar store. I got a couple of things waiting there already.
JD: Alright.
GP: Alright.

33. During the timeframe of the aforementioned phone call, I was contacted by the CS. The CS stated an unknown female subject was going to deliver heroin to two of DENSON'S known distributors, Brian BROWN and Edward SMITH, who had also been intercepted on the wire setting up what, based on my training and experience, I believe to be heroin deals with DENSON.

34. Between 4:48 p.m. and 4:50 p.m., investigators intercepted text messages to DENSON TARGET TELEPHONE 3 from POPE. The conversation was as follows.

GP: Blue Van
GP: They supposed to give her anything?

12

GP: ???

35.   DENSON did not responded to the text messages from POPE, likely due to having trouble with his telephone at that time. During later intercepted phone calls, DENSON explained that his phone was not working properly and he had to get it fixed.

36.   At approximately 5:00 p.m., investigators established surveillance at the Dollar General at 2422 West Division Street, Springfield, Missouri. Investigators observed SMITH meet with a female, who was later identified as Ceirra NASH, driving a blue GMC van with Missouri License plate DP8 P8F. That license plate was registered to POPE. Investigators observed SMITH get into the van with NASH and exit less than a minute later. SMITH then left the parking lot in a white Kia hatchback.

37.   A traffic stop was conducted of SMITH, based on probable cause of a drug transaction, by SPD Officer Adam Rowles. A probable cause search of the vehicle found SMITH to be in possession of 20 grams of a dark brown substance. I later field tested the substance and it showed the positive indicator for heroin. Based on the telephone calls, the nature of the interaction with NASH, and my training and experience, I believe SMITH had just purchased that heroin from NASH.

38.   On May 13, 2017, between 2:23 p.m. and 4:50 p.m., investigators intercepted text messages between DENSON TARGET TELEPHONE 3 and POPE. The conversation was as follows.

- GP: I'm finna turn the phone on. So I no my people should be ready for another round in bout an hour
- GP: She out now. Ready when you are, I'll keep her on Florida until then.
- JD: Bet
- JD: Ol girl still out
- GP: Waiting on you
- JD: Ready one time where to go
- GP: This it or you still waiting too?

13

JD: This it
GP: Popeyes
JD: 10m

39. Due to the aforementioned conversation, investigators established surveillance at the Popeye's Chicken at 1231 West Kearney Street, Springfield, Missouri. Investigators also attempted to establish surveillance at a home identified as POPE's on Florida Street, however, investigators did not reach the location in time to see if NASH left from the home on Florida Street. However, investigators did observe NASH driving the same blue GMC van a block away from the home. The vehicle was seen driving north on Johnston Avenue.

40. Investigators followed NASH to the Popeye's Chicken and observed her meet with BROWN. Surveillance of NASH was terminated at that time. Based on the investigation as outlined herein, the calls above and below, and my training and experience, I believe that BROWN purchased heroin from NASH.

41. On May 15, 2017, investigators learned that POPE had a second residence in Battlefield, Missouri, at 4101 West Falcon Drive. I discovered this when checking utility accounts for POPE and found an active account at that address in POPE's name. Investigators conducted surveillance at 4101 West Falcon Drive and observed the same blue GMC van parked at the location. On that day, the vehicle left the location being driven by the same female (NASH) who had been observed during the previous drug transactions. A traffic stop was subsequently conducted on the GMC van, in order to identify NASH. NASH provided the name Mercedes Nash at the time of the stop. In an intercepted text conversation from DENSON TARGET TELEPHONE 3, POPE told DENSON that NASH had used her sister's name during the stop, so TFO Mittag obtained a photo of NASH and confirmed her identity with the Greene County deputy who had stopped her.

14

42. On May 15, 2017, between 12:48 p.m. and 3:54 p.m., investigators intercepted text messages between DENSON TARGET TELEPHONE 3 and POPE. The conversation was as follows:

- JD: Where can she go. One time. Fuc my other dude
- GP: Shid. her get ready for work and shit so she don't gotta come back. Then she can sit on Florida til it's time for her to go in.
- JD: One time. Where u want em
- JD: U sure she got time
- GP: Popeyes. 15 minutes
- JD: Ok
- JD: Pulling up
- GP: Had to stop and get it, should be pulling up if she hasn't already.

43. On May 16, 2017, between 7:35 p.m. and 8:49 p.m., investigators intercepted text messages between DENSON TARGET TELEPHONE 3 and POPE. The conversation was as follows:

- GP: Was sleep. What up?
- JD: She at work huh
- GP: No
- JD: U think she can come out. 2 people pretty much ready
- GP: Ok. Bouta send her, give me a second.
- JD: Just like when close to ready
- GP: Auto store on broadway
- GP: Kearney
- GP: Auto store on broadway
- JD: 2 times. One n one
- JD: Grey car n the regular person
- GP: Just tell them blue van. She gone sit there.
- JD: Grey car there. Regular pulling
- JD: Up
- GP: You sure?
- GP: Did you tell grey car blue van, she just sitting there. Other chic came and gone.
- JD: Other one see her now

44. Based on the aforementioned conversation, investigators established surveillance at the O'Reilly's Auto Parts store located at 1015 West Kearney, Springfield, Missouri. They also established surveillance at the residence of Claude DAVIS, located at 1036 South Fort Ave.

15

At approximately 9:00 p.m., DAVIS was observed leaving the residence in his gray Mazda sedan.

45. Investigators followed DAVIS as he drove to the O'Reilly's Auto Parts Store. Investigators again attempted to establish surveillance of the POPE's home on Florida Street in order to see NASH leave the residence, but surveillance was not established in time. NASH was again observed driving the same blue GMC van north on Johnston Avenue a block north of the home.

46. Investigators observed DAVIS meet with NASH in the parking lot of the O'Reilly's. A probable cause traffic stop was subsequently conducted on DAVIS. A probable cause search of the vehicle found DAVIS to be in possession of 20 grams of a dark brown substance. I later field tested the substance, and it showed the positive indication for heroin. Based on my training and experience, the investigation as outlined herein, and the text messages above, I believe that DAVIS purchased that heroin from NASH.

47. Between May 12 and May 17, 2017, while DENSON was in Chicago, Illinois, several phone calls were intercepted were he stated that POPE had gone back home to Springfield, Missouri, ahead of him.

48. On May 18, 2017, surveillance was conducted at 1200 West Florida Street, Springfield, Missouri. POPE was seen exiting the residence and leaving the location in the same previously mentioned blue GMC van that NASH had used to deliver heroin.

49. A traffic stop was conducted on the vehicle, based on a traffic violation, by SPD Corporal Jason Friend. A search of the vehicle and POPE was conducted due to the strong smell of burnt marijuana. No narcotics were found, but POPE was found to be in possession of approximately $6,000 in U.S. Currency. POPE had approximately $2,000 in U.S. currency in

his pocket, and the rest was found in the center console of the vehicle. POPE told Corporal Friend he worked as a barber. When Corporal Friend asked POPE where he worked, he stated he cut peoples hair at his residence. Corporal Friend asked POPE for consent to search his residence for drugs or money, and POPE denied consent. POPE was released at that time. Based on my training and experience and the investigation as outlined herein, I believe the U.S. currency was the proceeds of drug sales.

50. On May 18, 2017, I applied for and received a narcotics related search warrant for 1200 West Florida Street, one of POPE's residences. The search warrant was reviewed by Special Assistant United States Attorney Josephine Larison and then signed by U.S. Magistrate David P. Rush. Simultaneously, investigators established surveillance at POPE's other known address at 4101 West Falcon Drive, Battlefield, Missouri. Investigators observed POPE arrive at 4101 West Falcon Drive, where he stayed. Surveillance was maintained on 4101 West Falcon Drive while the search warrant was executed at 1200 W. Florida Street.

51. During the search of the residence at 1200 West Florida Street, a handgun was seized and items of evidence linking POPE to that address. POPE was subsequently arrested for being a felon in possession of a firearm after he left the residence at 4101 West Falcon Drive in the same blue van. During POPE's arrest, he was found to be in possession of a Samsung flip style cellular phone and three Apple iPhone cellular phones, all of which are further described in Attachment A. The Samsung was found in POPE's front pants pocket and the iPhones were all found inside the van. Since the time of POPE's arrest, all four of the cellular telephones have remained in the custody of the DEA in Springfield, Missouri.

52. Based on my training and experience, I know that dealers in controlled substances will often use multiple cellular telephones to distribute controlled substances. Based on the

aforementioned information, I believe POPE was a significant distributor of heroin for the DENSON DTO. I also believe the cellular telephones will contain information and evidence which will help in the prosecution of POPE and show his role in the heroin conspiracy.

53. Your affiant respectfully requests that a search warrant be issued authorizing the DEA, specifically the undersigned or any other certified computer analysis forensic examiner, to conduct a thorough search of the contents of the items in Attachment A for the items listed in Attachment B, which are evidence of the commission of, and are contraband and instrumentalities of, criminal offenses concerning violations of 21 U.S.C. §§ 846, 843, and 841(a)(1).

*N. Mitt*

Nicholas C. Mittag
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me in my presence on this 3rd day of August, 2017.

*David P. Rush*

David P. Rush
United States Magistrate Judge

## Attachment A

### PROPERTY TO BE SEARCHED

The property to be searched is:

(a) an Apple iPhone, gray and black in color, with International Mobile Equipment Identity (IMEI) 35021076208636;

(b) an Apple iPhone, white in color, with IMEI 013988007227151;

(c) an Apple iPhone, black in color, with an unknown IMEI; and

(d) a Samsung Verizon flip style phone, black in color, with Mobile Equipment Identifier A0000047720234,

all of which were seized from Gerald POPE on May 18, 2017.

The cellular telephones are currently in the custody of the Drug Enforcement Administration (DEA) located at 3031 South Fort Avenue, Springfield, Missouri.

Attachment B

## PROPERTY TO BE SEIZED

All records on the device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841, 843, and 846, including:

a. Any and all documents, records, emails, instant messages/chats, text messages, video messages, or other communications, and Internet history (in documentary or electronic form) pertaining to the possession, receipt, distribution, or production of controlled substances;
b. Any and all records showing calls made, received, or missed pertaining to the possession, receipt, distribution, or production of controlled substances;
c. Any and all records showing text (SMS) messages or multi-media (MMS) messages made or received pertaining to the possession, receipt, distribution, or production of controlled substances;
d. Any and all voice messages pertaining to the possession, receipt, distribution, or production of controlled substances;
e. Any and all contact lists, calendar information, or other data pertaining to the possession, receipt, distribution, or production of controlled substances;
f. Any and all visual depictions, including still images, videos, films, or other recordings which pertain to the possession, receipt, distribution, or production of controlled substances;
g. Any and all data from programs, or "apps" that are used in furtherance of the possession, receipt, distribution, or production of controlled substances;
h. Any and all data contained on removable media pertaining to the possession, receipt, distribution, or production of controlled substances;
i. Any and all passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code;
j. Any and all records, documents, invoices, notes, and materials that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of the searched media; and
k. Any and all documents, images, and records indicating the owner and possessor of the searched media.